May it please the court, my name is Jonathan Salovey, representing the appellant Warren Wilder. I'd also like to introduce today Mr. Robert Goldsmith, who served as Mr. Wilder's trial counsel. Thank you. I'd like to reserve two minutes for rebuttal. Both the Supreme Court and this Court have recognized the highly coercive impact of appeals by law enforcement which pull on the parental heartstrings of suspects. In United States v. Tingle, this Court stated the relationship between a parent and a child embodies a primordial and fundamental value of our society. Similarly, in Brown v. Horrell, this Court stated that it recognized that the Supreme Court's decisions in Haynes v. Lynham demonstrate that threats and promises related to one's children carry special force. As to the issue of whether or not the admissions by Mr. Wilder were coerced by the two Homeland Security agents, it really brings the question, really what's fundamental to us? What are we all about? If you ask the question, what is most important to you? What is most important to everyone in this courtroom? I suspect that most people would say what's most important are the people we love most, namely our children, our spouses, our close family members. Counsel, what do I do with the district court's factual, I guess it's a mixed question of law and fact, I think it's at ER, I don't know if it's 263 or 363, it's page 117 of the transcript of the evidentiary hearing where he states, starting at line 21, the other statements by the agents collectively reflect that the agents were merely advising Mr. Wilder of the consequences of lying and that he should not seek to protect defendant Oberholzer over that of his family. And then he goes on to say there was a complete absence of any communication that could be characterized as a threat or promise or a coercive statement. Don't we have to find those findings to be clearly erroneous to accept your argument that this rendered the entire interrogation unconstitutional? I should say interview because the court found it wasn't even interrogation. I think that's one reason I started off my argument by quoting the excerpts from Tingle and Brown. And the fact of the matter is those are not purely issues of fact. These are Supreme Court decisions and decisions of this court that as a matter of law, not as a matter of fact, say that such statements, such tactics are not only improper, but they're highly coercive. Are you suggesting, because I read Brown a little differently, maybe you can point me to some other language. And obviously the situation there where it was a threat if you don't cooperate then maybe you can see the birth of your child. So if I take your point, are you saying that there's a bright line and you may not mention the family or children in any way? I think whenever you have cases... Well, that calls for a yes or no answer. The answer is it's not a bright line. But this court and the Supreme Court made it absolutely clear that, first, it's an improper tactic. Second, as a matter of law, as it's found, it is highly coercive. But just like any case, you have to look at the totality of the circumstances. But you're arguing for a bright line rule, are you not? I mean, part and parcel of determining that the statement was made is a factual finding as to what the agent said. And the district court heard the testimony and essentially found that what they were telling your client was, look, it's a crime to lie to federal agents. Are you really going to sacrifice your family in order to protect Mr. Overholzer? And you're saying that any reference to family at all renders the interview unconstitutional? I'm not saying that any reference to family renders it unconstitutional. But I am saying that, as a matter of law, it is highly coercive. If the district court finds facts sufficient to establish coercion, but isn't that inherently a factual determination that has to be made first, which is what makes it a mixed question of law and fact? I think, first of all, it's difficult to parse out because, in part, it's a factual conclusion, but it's also a conclusion of law. So that makes it a mixed question of law and fact, does it not? I mean, I don't understand why you're fighting me on this because it's got to be one or the other. It can't be purely a factual inquiry, and it can't be completely a legal inquiry. That leaves us with only one analysis. It's a mixed question of law and fact. I do agree, Your Honor, that in any case when you have issues of coercion, it is a mixed findings of fact and law. But sometimes findings of fact could ignore the law, and when Judge Jones— The district court didn't ignore the law here, did it? It was thoroughly apprised of the cases on which you're relying, and it heard the testimony, and it made credibility determinations as to exactly what the agent said. Respectfully, Your Honor, I do not believe that those findings were legally correct because Judge Jones stated— Well, clearly erroneous? I don't understand what you mean by legally correct. I can understand you quarreling with the application of the law to the facts, but first we have to determine what the facts were, and don't you have to show that the underlying factual finding is clearly erroneous before we can then conclude that the law was impermissibly applied? I think what you're doing here, Your Honor, is trying to separate the two, and I'm saying the two— Oh, it's a two-step process, Counsel. That's what totality of the circumstances means. The district court made a determination, a conclusion, that there was nothing that was said that could be termed threatening or coercive, and as I read Tingle, Brown v. Hurl, McShane, United States Supreme Court law, they're all saying it's highly coercive, that this is not a good thing, it's not a bright-line rule, but that use of this is highly coercive. But you have to put this in the standard that we're left with, which is the totality of the circumstances, and the totality of the circumstances is something that the district court went into in terms of the education, the home setting. You haven't challenged the fact that there was a finding that he was not in custody, which is important. So you have all these other factors. Doesn't that all weigh in to the basket to determine whether or not it was coercive? Certainly. I think all the factors do matter, and in this case the fact that he was not in custody, that the two Homeland Security agents completely turned it around. They used those circumstances, which normally would not be threatening, completely to the advantage. They used the fact that his wife was there. By making statements, it went much further than just simply saying, hey, if you make false statements, you could end up in prison. They were also suggesting that I'm all going to the family. Numerous, numerous references to the family, and I asked, why else would they be doing it? It's certainly not because they had a loving concern for Warren Wilder and his family. They were looking at the fact that his wife was present, and they were essentially using his wife as leverage to try to extract a confession. You're proper about telling a defendant who is giving a false story to protect another defendant. Look, you really want to sacrifice your family to protect this guy? Because that's essentially what he's doing, at least in the minds of the agents at that point. They're basically saying, you're going to throw them under the bus for him? That's what they're saying. Right, but first of all, why even bring the children in in the first place? Because he's lying to them about what his role was or knowledge was in regard to the offense, and the agents know enough based on their investigation that what he's telling them is simply not supported by the evidence. But they also made a statement suggesting that Warren Wilder should come up with an excuse and say that he did it to support his family because Mr. Oberholzer, the boss, made him do it. So they're even offering up an excuse, which is improper. They don't know that's true. They're saying, hey, come up with this excuse, and they're giving the impression that if you say this... He was their top salesman, was he not? He was. So what's wrong with addressing with this person that they're investigating a pecuniary motive for doing what he did? It's because, first of all, he's suggesting to Mr. Wilder that he come up with an excuse. And again, I think we're putting too much good faith in these two Homeland Security agents. They're pros. They understand. But your argument would forbid an officer interviewing a witness from ever suggesting to a witness, there might be an explanation here. Is it this? Is it A? Is it B? Is it C? Are you saying that's improper? I think when you look at the number of statements they made and you look at the totality of the circumstances, they were using the presence of his wife. They were using the fact that they knew... But you'd be arguing, if the wife wasn't here, you'd be arguing just the opposite, that her absence made the interview more coercive. I mean, usually the presence of a third party to an interview is not something that most law enforcement officers want, isn't it? Because you've got the potential now for having more than just the defendant's word against what he told the officers. Now we've got another witness to the interview. Well, rather than bringing him into custody, that certainly changes everything. But they saw what was in front of them, and they looked at the fact that his spouse was there. And I think, Your Honor, it's quite powerful. What's quite powerful? I mean, we've got Supreme Court cases addressing IRS interviews of a tax defendant in his living room and finding that's not a custodial interview. How is it different if it's in the backyard? I think that's the very point, that the agents used the setting of the backyard. Mr. Wilder could see everything that he was going to lose. He has his wife in front of him. They were essentially saying, Mr. Wilder, you're not a very good husband, and you're not a very good father. As a matter of fact, you're really not a man unless you confess to this because you're not thinking about the interests of your children. Well, you have to write a screenplay to come up with that scenario from the transcript, I think. Because I've read the transcript over and over. I think that there's some borderline issues here, but then you have to look at it in the totality. Because the children come up also naturally, such as, I have to leave to go pick, or we need to go pick up the children, you know, he says. And I think for them to say, well, this isn't exactly a conversation to have in front of your children, do you see anything wrong with that? I think they saw the fact. Well, I mean, just let's take that statement. I mean, in the course of this, the children need to be picked up. There's some dispute over whether they offered to adjourn the interview or not. But then Ms. Wilder said she's going to go pick them up. And they say this is not a conversation to have in front of the children. I don't really see, for example, that statement as providing any coercion at all. Well, they said this is a conversation you don't want to have in front of your children. But remember at that point, Mrs. Wilder was in tears. And then she says, tell them what you know. Essentially, they turned Mrs. Wilder to recruit her to extract a confession. And that was the turning point. They said, she's in tears, in tears. And, you know, ma'am, Mr. Wilder is married to this woman. She's in tears. She's saying, tell them what you know. So let's say the agents come in and the kids are in the living room. And they say, you know, we're here to investigate the situation with these Cisco cables. This is not a conversation we want to have with the children in the room. Would that be coercive so that we have the children go into another room? I think the idea was you don't have much time. And as a matter of fact, Mrs. Wilder called. Would that be coercive to make that statement? I think in the totality of the circumstances and looking at what the agents were doing, there's no question that they were taking advantage of the fact. Okay, so you haven't really answered my question because it gets us back to if you decline to answer these various scenarios, we have to take your argument to mean that you want a bright-line rule that the family can't be mentioned. So is that what you're asking us to adopt? No, I'm not asking for a bright-line rule. But I am saying and suggesting, just as this prior course law makes it very clear, that references to family members and loved ones has a highly coercive effect and that Judge Jodes' findings did not really recognize that. And that looking at the totality of the circumstances, this was no accident that the two Homeland Security agents repeatedly went to the issue of Warren Wilder's family. Thank you very much. You've extended all your time. I'm going to give you some time for rebuttal. We'll hear from the government. May it please the Court. Charlene Kosky for the United States. Regarding the voluntary confession issue, I think that the cases that were referenced with appellant's arguments are on point. I think that they speak for themselves. The circumstances here come nowhere near rising to the level of coercion that's required to render a statement involuntary. In Crawford, the Supreme Court said that even trickery and deceit are insufficient to render an interview involuntary unless threats or promises are made. The district court found that there were no threats or promises made. That's reviewed for clear error, and the record supports those findings. It's also not disputed that he was not in custody, that he was told the interview was voluntary. He was told he was not in custody. He was told he could end that interview at any time. He was interviewed at his home on the back deck. The agents were in plain clothes. They kept their weapons concealed. They identified themselves. He was allowed to get a drink or take a break if he needed one. He was free to move about. At his request, his wife was allowed to sit in on the interview and voluntarily left partway through to pick up the children, and they were never restrained. The statement regarding the children was an offhand statement made after an hour of interviewing where Mr. Wilder had already made inconsistent statements. The statements were inconsistent with what the interviewing agents knew. Well, I'm not sure it's fair to characterize it as an offhand statement. The district court didn't say that. What it said was, in essence, as Judge McEwen characterized it, you're going to throw your family under the bus in order to protect this guy? Right. Clearly there was a reason for telling the defendant you're at a decision point here in your life. Make the right choice. That's right. That's correct. And you might miss out on your children. In other words, come clean or you might miss out on your children. Correct. So it's escalating here from how's your kids to a conditional statement, isn't it? I wouldn't say that it – well, even if you termed it as a conditional statement, it still doesn't rise to the level of coercion that cases have recognized as required to render a confession involuntary. And also in the record is that the agents, when they made that statement, knew that other employees for the company had been offered things by Mr. Oberholtzer to stay quiet, or maybe not even to stay quiet, but after the seizure they were offered time off, they were offered airplane tickets. So in context of everything the officers knew, they'd also reviewed purchase orders. They knew that Mr. Wilder was a top salesman. They knew that he was involved in purchasing of Cisco products. When the interview first started, he said, I have nothing to do with Cisco products. And then later on in the interview he started saying that, well, he had some involvement with Cisco products. And so that's what escalated this conversation, and that's what prompted the statement, look, you need to stop putting Mr. Oberholtzer's needs ahead of yours and your family. You might miss out on your kids. I take it at that point they had already reviewed the emails between Wilder and the Chinese manufacturer with details about how to make the cables. They actually had not reviewed the emails at that point. They got into the emails around the same time as that, but it was in the summer of 2012 that they accessed them, and they really didn't review them until later. They had, however, reviewed a lot of the company's records, purchase orders, and other documents that had Mr. Wilder's name on them and knew that he was a top salesman and that he was a target of the investigation. At some point, counsel, can you address what happened to the cables that were seized in July 2012? Did the district court not consider those at all in its sentencing calculations? No. The cables that were destroyed, that were seized in August 2011, were immaterial to both Mr. Wilder's conviction and his sentencing. And you asked specifically about the sentencing, I think, so I will start there. Yeah. First, I just wanted to know whether or not they were included in the loss calculation, and the answer is no. No, and they weren't necessary for the loss calculation. I will say the government, in its brief to the district court, did note the retail value of those items, but the infringement amount, you still get to the same infringement amount. It only needs to be a reasonable estimate, and it only needs to be over $400,000, and you get there with or without those cables. The forfeiture amount on its own, which is based on the company's own records, shows the illicit proceeds over a five-year period were about $716,000, and those are just the proceeds. That's not including anything that was actually seized and never sold. So I think the evidence is pretty overwhelming, that the infringement amount was far beyond $400,000. And no matter which price base you use? Correct, regardless of whether it's wholesale or fair market value. Manufacturers suggested retail price. Correct, yes, you get there either way. The reference in the preliminary order of forfeiture to an amount just under $400,000? So there was actually a note that was an estimate of the counterfeit value of the products seized only on August 8th, and that was just under $400,000. Again, the infringement amount is based on the value of the infringed item in this circumstance, which is the Cisco retail price. And that also excludes all the other cables and all of the records of the company that get you far beyond $400,000. Happy to address any other questions? If there are no further questions, ask that the court affirm. Thank you very much. I'll give you a minute for rebuttal. We are submitting that Judge Johnson's findings were clearly erroneous, and I would point to the fact that Agent Larson testified on cross-examination. He was asked, well, when someone says, miss out on their children, they're meaning being taken away and going to jail, right? He says, we never said that. Question, I understand that, but doesn't that imply that? The answer, one might imply that. So it is very clear that it does have a coercive effect, and also I think just looking at the record in terms of the- Counsel, isn't that inherent in suggesting to the defendant that if he's going to lie to cover up for his boss, then it's going to have pretty severe consequences for him if he's going to sacrifice time with family versus doing time for the boss? The difference, this actually is a big difference between saying, that will have big consequences for him versus they'll have big consequences for him and his family. And the fact that the agents, again, not just an offhand remark, but they repeatedly went back, repeatedly went back to the issue of his family and his children. And I would suggest it was more than just a helpful remark. It was so much more than that. It was the agent's attempt to coerce the confession. And I think it's simply a sense of why are they here, what are they doing? Simply naive to just assume they were just doing it out of the goodness of their hearts to help Mr. Wilder out. They'd already confronted him, had they not, with the fact that his denial of having anything to do with Cisco and some of the other things that he was saying at the beginning of the interview wasn't truthful, and they warned him about lying to federal agents and the consequences of doing that, right? I think in isolation there's nothing wrong with doing that. But again, looking at the totality of the circumstances. But wasn't that statement made at about the same time as this statement was made about are you going to sacrifice your family for the boss? There were repeated statements made. Again, it was about a two-hour interview. And this statement and theme, they went back to it over and over and over again. And the record is not just one time. And it's not just Warren Wilder saying this. It's the agents saying it. It's the agents admitting to they made statements. It's Christine Wilder testifying to the same effect and Warren Wilder. All right, thank you. Thank you very much. Thank you for your argument. Thank both of you today. The case of United States v. Wilder is submitted.
judges: McKeown, Tallman, Gleason